Memorandum of Decision
On May 27, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Jose Guillermo C. and Madeline J. to their minor daughters, Shalene C., Glenda C., and Rosalee C. On May 24, 1999, a consolidated CT Page 7639 trial of the termination petitions took place in this court. For the reasons stated below, the court grants the termination petitions.
FACTS
The court finds the following facts and credits the following evidence.
A. The Parents
The father, Jose Guillermo C., is now twenty-five years old. He left school while in seventh grade in order to work on a farm. He began a relationship with the mother, Madeline J., in approximately 1993, but never married. On February 1, 1994, when the mother was only sixteen years old, they had their first child, Shalene, who is known as "Sheily." On September 21, 1995, Glenda was born. Only ten months later, on July 25, 1996, the mother gave birth to Rosalee.
DCF became involved in the case in June, 1996, just before Rosalee's birth, because of allegations of neglect. The father went to prison from July, 1996 to February, 1997 as a result of a violation of his probation for a 1994 risk of injury to minors conviction. This event left a teenage mother alone with three young children. DCF offered the mother a parent aid and referred her to family life services for teenage mothers and preschool intervention programs. The mother did not take advantage of these programs despite DCF's provision of transportation. A DCF home visit on December 31, 1996 revealed the mother's apartment to be filthy with insufficient food for the children. In January, a DCF worker brought food to the apartment for the children.
In late January, 1997, Rosalee was admitted to the hospital with pneumonia, bronchitis, and concerns about inadequate weight gain. Glenda was admitted at the same time with bronchitis. At about this time, the mother was evicted from her apartment. DCF again offered the mother a parent aid and housing assistance. The mother declined, saying she would take care of herself.
The mother moved in with her sister, Raquel. A DCF worker continued to express her concerns to the mother about Rosalee's insufficient weight gain and diaper rash. A home visit on March 1, 1997 revealed the apartment to be crowded and filthy, with the refrigerator almost empty, no formula for the baby, and almost no CT Page 7640 clean diapers. The girls had virtually no clean clothes and their heads were shaven because of lice.
DCF immediately took custody of the children with a ninety-six hour hold. DCF then obtained an order of temporary custody and the court entered specific steps for the parents to follow to facilitate the children's return. One of the specific steps was for the parents to keep their whereabouts known to DCF and to their attorney. The OTC was confirmed on March 19, 1997.
At some point between July, 1996 and February, 1997, DCF knew that the father was incarcerated but did not contact him. In March, 1997, when the problems with the girls became acute, DCF did attempt to locate the father but had no success. The father was not living with the children at the time of their removal. The father failed to appear at a court hearing on April 17, 1997.
The father's whereabouts remained unknown to DCF until May 12, 1997. On that day the father called DCF and spoke to DCF for the first time. DCF set up a meeting for May 19, 1997, which the father, mother, and children attended. The father admitted that, before his incarceration, he had not been working or paying child support.
DCF referred the parents to Catholic Family Services for an intensive family reunification program. The parents appeared in court on May 27, 1997. Over the next two months, however, the parents attended only about half of the parenting classes and family visits. The father's last visit with the children took place on July 3, 1997. The program evaluators concluded that the parents' insight and judgment was poor and recommended against family reunification in the future. Although DCF also referred the mother to a substance abuse evaluation, the mother did not appear for it.
In early July, 1997, the father became involved in an altercation with another person at the day incarceration center that he had been attending as part of his extended probation. Because the father appeared depressed and even suicidal concerning this possible violation of probation, Catholic Family Services took the father to a hospital for a psychiatric evaluation.
After his evaluation, the father's whereabouts became unknown for about a month. On August 1, 1997, the court adjudicated the CT Page 7641 children neglected and committed them to the custody of DCF. The parents had notice of the proceeding but did not attend.
The mother did not visit with her children between July 3 and November 6, 1997. The latter date marks her last visit with them. She last contacted DCF on March 26, 1998. At that time, she admitted that it was too late for her to reunify with her children. Despite diligent attempts, DCF has been unable to locate her since then. DCF believes that she is living somewhere in New Jersey. The mother did not appear for trial.
On August 5, 1997, the father was arrested and detained for burglary and interfering with an officer. He was later sentenced for those offenses and for violation of probation to an effective term of four and one-half years in prison. His expected release date is February 5, 2000 and his maximum release date is June 25, 2000.
DCF had called the Department of Corrections (DOC) in late July, 1997, and accurately learned that the father was not in DOC custody at the time. DCF did not call DOC again until January 5, 1998 and, at that time, learned that the father was incarcerated. DCF had not heard from the father in the meantime. The father began writing DCF to request visitation with and information about his daughters in December, 1997, although the case worker apparently did not receive a letter until February, 1998. Also in February, 1998, the father called DCF and requested visitation.
DCF denied the request. The father requested an administrative hearing. The hearing took place on April 3, 1998 and the adjudicator approved DCF's denial of visitation and its plan to file for termination. The father appealed to this court which, on January 4, 1999, found substantial evidence for the decision and dismissed the appeal.
While in prison, the father has continued to write letters to his daughters, or to DCF concerning his daughters, expressing concern for their well-being and extending them birthday and Christmas greetings. In prison, the father attends church, GED classes, and a drug rehabilitation course. He has also received psychiatric treatment there.
A psychological evaluation of the father took place in November, 1998. The evaluation revealed that the father had used cocaine for six years. At the time of the evaluation, the father CT Page 7642 was experiencing anxiety and depression due to his circumstances. The psychologist recommended that, upon release, the father receive counseling and address his substance abuse history. The evaluation concluded that, given all the circumstances including the father's incarceration and the age of the children, it is not likely that the father will be able to achieve the necessary degree of rehabilitation in order to resume a responsible position in his children's lives.
B. The Children
In June, 1997, after their initial foster care placement, the girls were placed together in a second foster home. In September, 1998, DCF placed the girls in the legal risk, or preadoptive, foster home of Mr. and Mrs. B. The girls have remained there since. DCF has contracted with the Village for Families and Children to provide assistance to the girls and the B. family in planning for possible adoption.
The girls are all healthy. Sheily, now five, and Glenda, who will be four in September, have overcome some delays in the development of their language and cognitive skills. They are in preschool and enjoying dance, painting, and other activities. For a while, Sheily was fearful that, when a DCF case worker came to visit, it meant that Sheily would have to leave her home. She is doing better now. Rosalee, who is almost three, has gained weight since being placed in foster care. She is in day care and looks up to her older sisters.
The B. family has provided a well-structured, organized environment in which to raise the girls. The foster parents have proven to be energetic and committed. They very much desire to adopt the girls. The girls have adjusted well to their new home. They call their foster parents "Mommy" and "Daddy." They do not speak of their natural parents.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification CT Page 7643 efforts." General Statutes § 17a-112(c)(1).[2] "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B., 50 Conn. App. 554, 566, 718 A.2d 997
(1998).
DCF made reasonable efforts to locate the mother and reunify her with her children, but those efforts, by the mother's own admission, were not successful. DCF also made reasonable efforts to locate the father and reunify him with his children between March, 1997 and July, 1997. The father's whereabouts were unknown during the first several months of this period and, when he resurfaced, DCF referred him to an intensive family reunification program.
The court cannot say, however, that the evidence clearly and convincingly demonstrates that DCF made reasonable efforts to locate the father between the end of July, 1997 and early January, 1998. Although DCF is an overburdened agency, one phone call to DOG at the beginning of a five month period is hardly a reasonable effort. This point is especially true given that DCF knew or should have known that the father at the time was on probation and in early July had become involved in an incident that might have put him in violation of his probation. Despite this information, there is no evidence that DCF called the Office of Adult Probation in an effort to locate the father.
The court does find, however, that the father was "unable . . to benefit from reunification efforts." General Statutes §17a-112(c)(1). The father had just failed to complete an intensive reunification program. He had not been working or supporting his children. He had a disturbing criminal record involving risk of injury to minors and violation of probation. He was facing lengthy period of incarceration. Coupled with the fact that DCF did make reasonable efforts to locate and reunify the father from March to July, 1997, the fact that the father was unable to benefit from further efforts satisfies the statutory standard.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael R., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § CT Page 764417a-112(c)(3). General Statutes § 17a-112(c)(3) (Rev. to 1997) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112 (d). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no material amendments to the petition, the adjudicatory date in this case is May 27, 1998.[3] DCF has alleged the grounds of abandonment and failure to rehabilitate against both parents. The court finds that DCF has proven its allegations by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id., 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
The mother abandoned her children after July, 1997, when, with one isolated exception, she stopped visiting them. Although the period between July, 1997 and May, 1998 is less than one year, the mother's concession to DCF in March, 1998 that she no longer believed she could reunify with her children, and her disappearance since then, makes it appropriate to waive the one year requirement "to promote the best interest of the child[ren]." General Statutes § 17a-112(d)(1) (Rev. to 1997).
The father's case requires more discussion. Although there is evidence that the father did not work and support his children prior to March, 1997, DCF failed to introduce affirmative evidence establishing where the father was living, what the CT Page 7645 father was doing and, in general, whether the father maintained a reasonable, continuing degree of concern for the children before that date. The social study mentions only that the father was incarcerated from July, 1996 to February, 1997. Incarceration alone, however, neither establishes nor constitutes a defense to abandonment. See In re Juvenile Appeal (Docket No. 10155),187 Conn. 431, 443, 446 A.2d 808 (1982). This court will not assume that the father abandoned his children before March, 1997 because it is DCF's burden to prove this element by clear and convincing evidence. It did not do so.
The father did abandon his children between March and May, 1997, when the evidence reveals that he was out of prison yet neither DCF nor the court could find him. The father then reappeared for two months while he participated, albeit inconsistently, in the family reunification program. His whereabouts again became unknown. Although, as stated, DCF was lax in not in following up with DOC or contacting the father's probation officer, the father himself had a moral obligation to contact and support his children, regardless of DCF's initiatives. See In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 15, 438 A.2d 801 (1981). Further, one of the specific steps entered in March, 1997 was for the father to keep his whereabouts known to DCF and his attorney. Here the evidence affirmatively shows that the father did not attempt to contact DCF concerning his children until December, 1998. At that point he began writing letters requesting visitation and expressing concern for his children.
DCF has thus proven that the father abandoned his children for a total of about eight months. Here again it is appropriate to waive the one year requirement "to promote the best interest of the child[ren]." General Statutes § 17a-112(d)(1) (Rev, to 1997). The eight months period is more than half of the statutory standard and the evidence does at least show that the father failed to work or support the children before the eight month period. As discussed elsewhere in this opinion, the father has failed to rehabilitate himself, his children have not expressed an interest in him, and they have adjusted to a supportive preadoptive home. Given these factors, the court waives the one year requirement and finds that DCF has proven by clear and convincing evidence that the father has abandoned his children.
2. Failure to Rehabilitate
CT Page 7646
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(C). No dispute exists that the court adjudicated the children neglected on August 1, 1997, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(C). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require parents to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d (1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
The mother has essentially admitted that she has failed to rehabilitate. Confirming her admission is her long history of neglecting her children's basic sanitary, dietary, and medical needs, her failure to complete any rehabilitative programs, and her disappearance from her children's lives.
The father has also failed to rehabilitate himself. His most obvious problem is his involvement with the criminal justice system. His 1994 conviction for risk of injury to minors is a matter of grave concern that requires substantial rehabilitative efforts. He did not make them. Instead the father violated probation twice, the second time after DCF had taken custody of the children. The court cannot readily conclude that someone who CT Page 7647 violates his criminal probation during neglect proceedings has rehabilitated himself, because the pendency of a neglect petition is itself a probationary period for the right to have custody of a child and, if a parent has violated one probation, it becomes difficult to conclude that he has successfully completed the other. Finally, the father will not likely be released from prison until sometime in 2000. He is simply not available until then to become a responsible person in his children's lives.
The father has a myriad of other problems to address once he is released from prison. Among them are his substance abuse history, his lack of education or record of steady employment, and lingering mental health concerns. In addition to these concerns about the father's personal rehabilitation, the father did not rehabilitate his relationship with his children. He had an opportunity to do so in May, 1997, but failed to take advantage of it. Based on all these facts, DCF has proven by clear and convincing evidence that, for a period of over one year, the father has failed to rehabilitate himself within the meaning of the termination statutes.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Sheily, Glenda, and Rosalee C. clearly and convincingly requires termination of the parental rights of their natural parents. The children are lucky to have been taken out of the neglectful and unhealthy home of their mother and placed in foster care. While the mother has disappeared and the father has gone back to prison, the children have overcome their deficits and have prospered. The children do not speak of their natural parents, who are essentially strangers to these children.
The children have instead become attached to their foster parents, Mr. and Mrs. B. The foster parents have provided the structure and security that will allow these girls to have a happy and safe childhood. Given that the present foster home is the third for these young girls, and that this home is eminently well-suited for them, they are entitled to remain in this home. CT Page 7648 Termination of parental rights will allow the foster parents to adopt the girls so that they can have this permanency.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P., 39 Conn. App. 353,362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for the children and offered the parents an intensive family reunification program. DCF also offered the mother assistance with parenting skills and a substance abuse evaluation. These services were relevant to the parent's needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification. Although the father had an obligation to advise DCF of his whereabouts, DCF should have made additional efforts to locate the father between July, 1997 and January, 1998.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On August 1, 1997, the court entered the following expectations for the parents to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the child as often as DCF permits, (4) participate in counseling (parenting, individual, and drug/alcohol) and follow recommendations, 5) cooperate with random urine screens, 6) sign releases as requested, 7) secure and maintain adequate housing and income, 8) no substance abuse, and 9) no further involvement with the criminal justice system. As detailed above, DCF substantially met its obligation to CT Page 7649 provide assistance. The mother's compliance with these expectations was poor. The father's compliance was poor when he was not in prison. In prison, the father has enrolled in some rehabilitative programs. While he initially failed to advise DCF of his latest incarceration, he eventually did so and requested visits with his children. The fact that the father is in prison again, however, represents a substantial failure to meet expectations.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are very attached to their foster family. The children do not have any relationship with their natural parents.
5) The age of the child.
Sheily is five years old, Glenda will be four in September, and Rosalee is almost three years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the parents did not adjust their circumstances in time to make it in the girls' best interest to return to their home. The parents did not maintain regular visitation with the children or regular contact with DCF.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent. CT Page 7650
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference of third parties or economic circumstances beyond their control.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Shalene, Glenda, and Rosalee C. for a termination of parental rights to enter with respect to the mother, Madeline J., and the father, Jose Guillermo C. Accordingly, the court hereby terminates all parental rights. The court further orders that the Commissioner of DCF is appointed statutory parent for the girls for the purpose of securing an adoptive family. If the current foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court